IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Joseph Zulock,                               :
                                             :        Case No. 1:07-cv-364
                    Plaintiff,               :
                                             :        District Judge Susan J. Dlott
          v.                                 :
                                             :        ORDER
Thomas Shures, et al.,                       :
                                             :
                    Defendants.              :

          This matter comes before the Court on (1) Defendants City of Middletown and Frank

Hensley's Motion for Summary Judgment (doc. 24) and (2) Defendant Thomas Shures' Motion

for Summary Judgment (doc. 25).  In this case, Plaintiff Joseph Zulock alleges that the City of

Middletown and two of its police officers violated his Constitutional rights pursuant to 42 U.S.C.

§ 1983 and committed various common law torts against him.  Defendants deny liability.  For

the reasons that follow, the Court **GRANTS** the City of Middletown and Frank Hensley's

motion and **GRANTS IN PART** and **DENIES IN PART** Thomas Shures' motion.

## I.        BACKGROUND

### A.        Factual History

#### 1.        The Incident as Described by Plaintiff Zulock and Defendant Shures

          Joseph Zulock was involved in a rear-end collision on the evening of May 8, 2006 on his

way home from a bar.  (Doc. 41 ¶ 41.)  Zulock failed to stop and exchange information with the

other driver in violation of Ohio law.  (Id. ¶ 42.)  Zulock had consumed alcohol that evening —

three beers between 5:00 p.m. and 7:00 p.m. according to his testimony.  (Zulock Dep. 30.)  He

also had taken that day two 500 mg Vicodin tablets and one Ativan tablet, an antidepressant,

both of which had been prescribed by his physician.  (Id. 28-30.)  Zulock was 6 feet 4 inches tall and he weighed 225 pounds on the day of the incident.  (Id. ¶ 62.)

Zulock arrived back at his mother's house after the accident at approximately 8:30 p.m. (Id. ¶ 43.)  His mother was the only other person home.  (Id. ¶ 44.)  Zulock told his mother that the police might come looking for him.  (Id. ¶ 45.)

Officer Thomas Shures was working the afternoon shift as a patrol officer for the Middletown Police Department when he was dispatched to investigate the hit-and-run accident. (Id. ¶ 1.)  Officer Shures was wearing a police uniform.  (Id. ¶ 10.)  The driver at the scene advised Officer Shures that a vehicle struck her car twice and the other driver left the area without making contact with her.[1]  (Id. ¶ 2.)  The driver had written down the license plate number of the vehicle that had struck her.  (Id. ¶ 3.)  The plate belonged to Zulock, with an address of 608 Young Street in Middletown.  (Id. ¶ 4.)

Officer Shures proceeded to that address to speak with Zulock and he saw a vehicle at the residence that matched the description given by the driver at the accident scene.  (Id. ¶¶ 5-6.)  He verified the license number and checked to see that the radiator was still warm.  (Id. ¶ 7.)  Officer Shures walked up the steps to the front porch, opened the screen door and held it propped open against his body while he knocked on the inner door.  (Id. ¶ 8.)  Zulock's mother opened the door and told Officer Shures that her son was the owner of the vehicle.  (Id. ¶ 9.)  Officer Shures could see Zulock standing in the kitchen.  (Id. ¶¶ 11, 47.)  The front door to the house opened into a hallway that led directly into the kitchen.  (Id.)

---

[1] Zulock admitted at his criminal trial to being involved in an accident, but he denied that he hit the other driver's car "twice."  (Criminal Trial Transcript ("CTT") at 218, lines 10-11.)

2

What happened after Officer Shures saw Zulock standing in the kitchen is disputed. Officer Shures testified that he asked Zulock to step outside to discuss the car accident. (CTT at 76.)[2] When Zulock turned to look at Officer Shures, Officer Shures saw that Zulock was carrying what he described as a large knife in Zulock's right hand. (Id. at 76-77.) The knife was a serrated bread knife with a 10-inch blade. (Zulock Dep. 46, 48.) Officer Shures testified that Zulock looked at him for a second, pointed the knife tip at him, and said "Fuck you." (CTT 76-77.)

Officer Shures testified that he then put his hand on his weapon and told Zulock using a "command voice" to put the knife down and come outside. (Id. at 77.) Officer Shures believed that Zulock was acting aggressive towards him based on the facts that he had "brandished the knife," had "squared up his shoulders and body," and had "lowered his head and was kind of looking out from underneath his eyebrows." (Id.) Officer Shures testified that Zulock was ten to twelve feet from him while holding the knife. (Id. at 78.) Officer Shures had been trained that, as a general rule, it takes a minimum of twenty-one feet between an officer and a knife-armed suspect for the officer to successfully defend himself. (Id. at 70-71.)[3] Accordingly, Officer

---

[2] Both Officer Shures in his briefs moving for summary judgment (docs. 25 and 40) and Plaintiff Zulock in his briefs opposing summary judgment (docs. 32 and 41) cite extensively to the criminal trial transcript of State of Ohio v. Joseph Zulock, No. CR-2006-05-0918 (Butler Cty. Ohio, C.P.). Both parties assume the admissibility of the CTT testimony without consideration of the hearsay rules contained in the Federal Rules of Evidence. Because both parties have cited to the CTT testimony to establish the disputed and undisputed facts, and because neither party has objected, the Court will consider the CTT testimony at summary judgment. However, the Court cautions the parties that the use of the CTT testimony at a trial in the matter will be governed by the Federal Rules of Evidence.

[3] Defendant's expert witness, Joseph J. Stine, opined that the 21-foot rule was considered dogma in training police officers, but that he favored an even greater distance for ensuring safety. (Doc. 25-7 at 12-13.)

Shures drew his firearm, but kept it at his side, as he repeated his command. (Id. at 79.) Officer Shures testified that Zulock responded, "Fuck you, motherfucker. Kill me." (Id.) Officer Shures then pulled Zulock's mother onto the porch so she was not in between Officer Shures and Zulock. (Doc. 41 ¶ 23.) Officer Shures raised his weapon and pointed it at Zulock. (Id.) Officer Shures again repeated his command. (Id. ¶ 24.) Zulock stood and thought for a second, and then set the knife down on the kitchen table. (Id.)

Officer Shures testified that he commanded Zulock to step away from the knife and to step towards the entryway so that Officer Shures could secure him. (CTT 81-82.) Officer Shures testified that he took two or three steps inside the doorway to meet Zulock. (Id. at 82.) Officer Shures stated that Zulock approached him, looking "combative" and "angry" with his "jaw clenched and his brow furrowed." (Id. at 85-86.) Officer Shures commanded Zulock to turn around and place his hands on top of his head and that Zulock complied. (Id. at 81-82.) Officer Shures testified that he started to put his revolver away and reach for his handcuffs, but that Zulock said "Fuck this" and ran back approximately three steps to the kitchen table where he picked up the knife again. (Id. at 82-83.) He testified that when Zulock again turned towards him with the knife and began to advance, that he re-withdrew his weapon, took several steps backward towards the doorway to create distance between him and Zulock, and then fired three shots at Zulock. (Doc. 41 ¶ 57; CTT 83-84.) One of the shots struck Zulock. (Doc. 41 ¶ 57.)

Zulock denies Officer Shures' statement of the facts. According to Zulock, he was making hot dogs when Officer Shures arrived and he was going to use the knife to open the hot dog package. (Zulock Dep. 47-48.) Zulock testified that Officer Shures asked him multiple times to drop the knife or put down the knife. (Id. 48-51.) Zulock's initial response was to make

a sarcastic comment about not being permitted to cook in his own kitchen. (Id.) Zulock admitted to saying "Fuck you" to Officer Shures several times during their encounter, including after Officer Shures' second command to drop the knife. (Id. 51-52; Doc. 41 ¶ 53; CTT 221.) Zulock admitted he was holding the knife when he cussed at the officer. (Zulock Dep. 51.) However, Zulock denied that Officer Shures requested him to step outside, denied calling Officer Shures a "motherfucker," and denied saying "kill me." (Zulock Dep. 48, 51-52; CTT 218.)

Zulock testified that he placed the knife on the kitchen table after Officer Shures had requested or ordered him to do so multiple times. (Zulock Dep. 50.) Zulock saw Officer Shures standing in the front doorway between the porch and the house foyer when he placed the knife down. (CTT 222-23.) Zulock denied stepping towards Officer Shures to permit himself to be secured. Rather, Zulock stated that he picked the knife back up seconds later and turned away from Officer Shures intending to put the knife in the sink located on the back wall. (Id.; Zulock Dep. 51.) Zulock did not tell Officer Shures why he picked up the knife again. (Doc. 41 ¶ 59.)[4] Zulock heard Officer Shures yell "I said put the fucking knife down" and turned and glanced over his left shoulder at Officer Shures who was standing by the front door. (CTT at 222-23.) Zulock admitted to making another sarcastic comment in response such as "What, are you going to kill me for cooking?" (Id. at 222, 232.) Zulock testified that Officer Shures shot him at that point, while Zulock was turned away from him. (Id. at 223.)

After Zulock was shot, he fell to the ground and the knife came out of his hand. (Doc. 41 ¶ 36.) Officer Shures called for a paramedic. (Id. ¶ 37.) Officer Shures picked up his handcuffs

---

[4] Zulock claimed that he picked up the knife so that the child he calls his grandson would not reach it at the table. (Doc. 41 ¶ 60.) He admitted that the child was not home at the time and that the knives were usually stored in a knife block which was within the child's reach. (Id.)

and secured Zulock's hands.  (Id. ¶ 38.)  Paramedics found Zulock laying in the kitchen with his

head in the entryway between the foyer and the kitchen and his feet pointing towards the back

wall of the house.  (CTT 186-87.)  Shell casings were found on the front porch, which Zulock

suggests is an indication that Officer Shures fired his shots from the front doorway.  (Id. 109-13,

260.)  Zulock was taken to the hospital for medical treatment.  His blood alcohol content later

that night at the hospital measured at .236.  (Doc. 14-2 at 3.)[5]

### 2.    The Subsequent Investigation

Defendant Frank Hensley, a detective with the City of Middletown, was assigned on May

8, 2006 to investigate the incident at Zulock's residence.  (Doc. 42 ¶ 1.)  Upon arriving at the

scene, Det. Hensley secured the scene of the shooting and spoke to Chief Bruck, Deputy Chief

Hoffman, and other officers.  (Id. ¶¶ 2-3.)  Det. Hensley drafted an affidavit and presented it to

the magistrate to obtain a search warrant of Zulock's residence.  (Id. ¶ 4.)  Upon obtaining the

search warrant, Det. Hensley delegated the crime scene investigation to another detective, but

did conduct a walk through the crime scene himself. (Id. ¶¶ 5-6.)

While at the crime scene, Defendant Hensley briefly interviewed two eye witnesses,

Destry Hogstein and Christina Young, and then had them transported to the police station where

he conducted more in-depth interviews.  (Id. ¶ 7.)  He also spoke to Plaintiff's mother, Mabel

Zulock, and numerous investigative officers at the crime scene.  (Id. ¶ 8.)  Christina Young told

Det. Hensley at the police station that she and Destry Hogstein had been walking their dog

---

[5] Zulock ddid not deny what the medical report stated, but he attempted to rebut the
report with testimony of an EMS worker who came into close contact with Zulock that night and
did not smell alcohol on his breath.  (CTT 190-91.)  Zulock admitted that doctors have told him
that he is an alcoholic, but he continues to drink socially.  (Doc. 41 ¶ 63.)

across the street from Zulock's residence just prior to the shooting incident. (Id. ¶ 9.) Young saw Officer Shures go up on Zulock's porch and knock on the door. (Id. ¶ 10.) Young told Det. Hensley that Plaintiff's mother answered the door, "and just right after that . . . Shures began yelling, drop the knife, drop the knife, repeatedly." She then heard the shots. (Id. ¶ 11.) Destry Hogstein told Det. Hensley "the same general story." (Id. ¶ 12.) Hogstein told Det. Hensley that he saw Officer Shures go to the front door of the residence, and that Plaintiff's mother answered the door. (Id. ¶ 13.) Hogstein told Det. Hensley that he heard Officer Shures tell someone to drop the knife. (Id. ¶ 14.)

Det. Hensley also received a statement of the events from Officer Shures.[6] Officer Shures stated he knocked on the front of the Zulock residence, and Plaintiff's mother answered. (Id. ¶¶ 15-16.) Officer Shures told Det. Hensley that he could see Zulock in the kitchen holding a knife in his hand. (Id. ¶ 17.) Officer Shures immediately began telling Zulock to drop the knife. (Id.) Officer Shures reported to Det. Hensley that Zulock momentarily placed the knife on the kitchen table, and then he picked up the knife again, and positioned it over his shoulder. (Id. ¶ 18.) Officer Shures advised Det. Hensley that Zulock started to advance towards him with the knife in his right hand over his shoulder in a stabbing-type motion. (Id. ¶ 19.) Officer Shures told Det. Hensley that he fired three shots and Plaintiff fell to the floor after the last shot. (Id. ¶ 20.) Officer Shures told Det. Hensley that he had been standing at the threshold of the front door during the entire incident. (Hensley Dep. 36, 38.) Officer Shures' initial statement to

---

[6] Zulock does not dispute that Young, Hogstein, or Officer Shures made the reported statements to Det. Hensley. He points out, however, that there were contradictions between the statements that Officer Shures reportedly made to Det. Hensley and the testimony he gave at Zulock's criminal trial.

Det. Hensley about where he was standing was consistent with the testimony of the witnesses to the incident, (CTT 48, 51, 61-62), but was inconsistent with his later testimony at the criminal trial wherein he testified that he had stepped into the house to handcuff Zulock after Zulock put down the knife.

On the day after the shooting, Defendant Hensley spoke with Zulock in the hospital. (Doc. 42 ¶ 21.)  Det. Hensley mirandized Zulock, and asked what happened.  (Id. ¶ 22.)  Zulock told Det. Hensley that he rcould not remember what had happened at his house.  (Id. ¶ 23.)  Zulock told Det. Hensley that he had no recollection of anything after he left the bar until he was in the hospital.  (Id. ¶ 24.)  On May 9, 2006, after meeting with Zulock at the hospital, Det. Hensley initiated a charge of felony assault against Zulock.  (Doc. 41 ¶ 78; Doc. 42 ¶ 25.)

Major Mark Hoffman of the Middletown Police Department also was assigned to investigate the incident, but his investigation focused on the use of force by Officer Shures. (Hoffman Dep. 14-15.)  Major Hoffman interviewed both Officer Shures and Zulock as part of his investigation.  (Id. at 17; Doc. 41 ¶ 64.) Officer Shures told Major Hoffman that he stepped inside the house to place handcuffs on Zulock after Zulock initially had placed the knife on the kitchen table, but backed up and retreated when Zulock picked the knife up again. (Hoffman Dep. 17-18, 22.)  On May 10, 2006, Zulock told Hoffman that he remembered the alcohol and drugs he had taken that day, but did not recall anything about the shooting.  (Doc. 41 ¶ 64; Hoffman Dep. 15-16.)  Major Hoffman concluded based on the physical evidence, including the location of the shell casings on the porch, that Officer Shures was standing at or near the front doorway when he fired the shots.  (Hoffman Dep. 24.)  Major Hoffman concluded that Officer Shures' use of force had been proper in the situation.  (Id. at 33-34.)

On May 19, 2006, the Middletown Municipal Court conducted a preliminary hearing to determine whether there was probable cause that Zulock committed the charged offense. (Doc. 41 ¶ 80.) The Court concluded that the State had established probable cause. (Id. ¶ 82.) A Butler County grand jury indicted Zulock on the charge on June 13, 2006. (Id. ¶ 79; Doc. 42 ¶ 28.) At the Court of Common Pleas, Zulock filed a motion to suppress challenging the legality of Officer Shures' warrantless entry into his home. (Id. ¶ 83.) The Court of Common Pleas denied the motion on August 8, 2006. (Id. ¶ 84.) A jury ultimately found Zulock not guilty of felony assault. (CTT 331.)

**B.     Procedural History**

On May 8, 2007, Zulock initiated the instant suit against Officer Shures, Det. Hensley, and the City of Middletown. Zulock asserted the following causes of action:

| | |
|---|---|
| Count 1: | Excessive force (Fourth, Eighth, and Fourteenth Amendments) against Officer Shures; |
| Count 2: | Illegal arrest (Fourth and Fourteenth Amendments) against Officer Shures; |
| Count 3: | Malicious prosecution (Fourth and Fourteenth Amendments) against Officer Shures and Det. Hensley; |
| Count 4: | Substantive due process (Fourteenth Amendment) against Officer Shures and Det. Hensley; |
| Count 5: | Malicious prosecution (Ohio common law) against Det. Hensley; and |
| Count 6: | Respondeat superior (Ohio common law) against Middletown. |

(Doc. 1.) Zulock subsequently clarified that all claims against Officer Shures and Det. Hensley were intended as personal capacity claims only. (Doc. 32 at 19.)

**II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> at 252.

## III. ANALYSIS

### A. Claims Against Defendant Hensley and the City of Middletown

#### 1. Count 3: Malicious Prosecution Pursuant to the Fourth Amendment

In this claim, Zulock alleges that Det. Hensley is liable for malicious prosecution in

violation of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983.  Section 1983 imposes

civil liability against a person who acts under the color of state law to deprive another of "any

rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "To

state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed

favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the

United States (2) caused by a person acting under the color of state law."  Phillips v. Roane Cty.,

Tenn., 534 F.3d 531, 538 (6th Cir. 2008) (citation omitted).  Det. Hensley does not dispute that

he was acting under the color of state law, but he asserts that he did not violate Zulock's

constitutional rights.

The Sixth Circuit has recognized a claim for malicious prosecution pursuant to the Fourth

Amendment.  Thacker v. City of Columbus, 328 F.3d 244, 259 (6th. Cir. 2003)  To establish

such a claim "a plaintiff must show, at a minimum, that there was no probable cause to justify

[his] arrest and prosecution."  Id. (internal quotation and citation omitted).  A plaintiff also must

show that the defendant made, influenced, or participated in the decision to prosecute.  See Peet

v. City of Detroit, 502 F.3d 557, 580 (6th Cir. 2007) cert. denied 128 S.Ct. 2430 (2008).  The

Sixth Circuit otherwise has not defined the contours of a malicious prosecution claim under the

Fourth Amendment.  Peet, 502 F.3d at 579.

Defendant Hensley moves for summary judgment on the basis that he has qualified

immunity from suit and on the merits.  The doctrine of qualified immunity provides "that

government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982).  To determine whether qualified immunity attaches, the Court first must ask if the facts alleged, taken in the light most favorable to the plaintiff, show that the government official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Parsons v. City of Pontiac, 533 F.3d 492, 500 (6th Cir. 2008).  If there was not a constitutional violation, then there is no need to inquire further about qualified immunity.  Id.  If there was a constitutional violation, the Court then must ask if the specific rights violated were clearly established.  Id. at 202; see also Parsons, 533 F.3d at 500.  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202.

Det. Hensley contends that the malicious prosecution claim fails because he had probable cause to initiate criminal proceedings against Zulock.  To begin, Det. Hensley points to the probable cause finding made by the Butler County grand jury.  The Sixth Circuit has stated that the issuance of an indictment by a grand jury in criminal proceedings can have a preclusive effect in a subsequent civil lawsuit in which malicious prosecution is alleged.  See Barnes v. Wright, 449 F.3d 709, 716 (6th Cir. 2006.)  The Barnes court stated:

> [I]t has been long settled that "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer."  Therefore, because [Barnes] was indicted pursuant to a determination made by the grand jury, he has no basis for his constitutional claim.

Id. (quoting Higgason v. Stephens, 288 F.3d 868, 877 (6th Cir. 2002)).

Zulock argues that the probable cause finding made during the preliminary hearings at

Zulock's criminal trial should not have a preclusive effect here because Officer Shures presented false testimony. Zulock disputes Officer Shures' testimony about whether Zulock threatened him or tried to attack him with the knife. The <u>Barnes</u> decision can be read to reject that argument because the plaintiff there also had argued that the defendant police officers had misled the grand jury. <u>See</u> 449 F.3d at 716 (rejecting the plaintiff's claim that "that the defendants misled the grand jury, which led to his improper arrest"). However, the Sixth Circuit stated in a later case that "[a]n exception to the <u>Barnes</u> rule applies where the indictment was obtained wrongfully by defendant police officers who knowingly present false testimony to the grand jury." <u>Cook v. McPherson</u>, 273 F. App'x 421, 424 (6th Cir. 2008); <u>see also</u> <u>OPW Fueling Components v. Works</u>, 1:06cv187, 2007 WL 1406956, *6 (S.D. Ohio May 9, 2007) ("[W]here there is evidence of false statements or misrepresentations by law enforcement officials during the criminal proceeding [ ] the finding of probable cause in a preliminary state criminal hearing lose[s] its preclusive effect."). A plaintiff seeking to establish this exception must present more evidence than merely that he was acquitted on the underlying charge for which he was indicted. <u>See</u> <u>id.</u> The plaintiff's ultimate burden is to prove a lack of probable cause.

"The Supreme Court has defined 'probable cause' as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" <u>Jolley v. Harvell</u>, 254 F. App'x 483, 486 (6th Cir. 2007) (quoting <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 37 (1979)). In this case, Det. Hensley initiated a criminal charge of felony assault against Zulock on May 9, 2006 after completing an initial investigation. Zulock has not established that Det. Hensley influenced the decision to prosecute

Zulock after that date. Ohio's felony assault statute states in relevant part that "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." Ohio Rev. Code § 2903.11(A)(2). The act of brandishing a knife can be sufficient to justify a felony assault charge. See e.g., Ohio v. Wiseman, No. CA2004-06-072, 2005 WL 1502148, ¶¶ 19-23 (Ohio App. June 27, 2005); Ohio v. Rivers, No. 81929, 2003 WL 21555127 ¶¶ 32-33 (Ohio App. Jul.10, 2003).

Prior to initiating the felony assault charge, Det. Hensley had walked through the crime scene, talked to investigating officers, interviewed Officer Shures, and interviewed Zulock's mother and two eyewitnesses. Two witnesses told Det. Hensley that Officer Shures had knocked on Zulock's door, that Zulock's mother had answered the door, that Officer Shures had repeatedly yelled at someone to drop the knife, and that Officer Shures had then fired shots. The knife in question was a bread knife with a 10-inch serrated blade. Officer Shures told Det. Hensley that Zulock was holding the knife in the kitchen and that he told Zulock to drop it. Officer Shures told Det. Hensley that Zulock momentarily put the knife down, but picked it up again and positioned it over his shoulder. Finally, Officer Shures told Det. Hensley that he fired three shots at Zulock when Zulock advanced towards him with the knife. Significantly, Det. Hensley also interviewed Zulock under oath before initiating the charges. Zulock told Det. Hensley that he had no memory of the incident, and therefore, he did not refute the statements of Officer Shures or the other eyewitnesses. Given these facts known to Det. Hensley on May 9, 2006, Zulock has not as a matter of law met his burden of establishing that Det. Hensley lacked probable cause to initiate a charge of felony assault. There is no constitutional violation and Det. Hensley is entitled to qualified immunity from suit on this charge.

Accordingly, the Court will **GRANT** summary judgment to Det. Hensley on Count 3, the claim for malicious prosecution in violation of the Fourth and Fourteenth Amendments.

### 2. Count 4: Substantive Due Process

Zulock alleged this cause of action against Officer Shures and Det. Hensley. Both Defendants moved for summary judgment. Zulock conceded in his response thereto that the claim is not viable and should be voluntarily dismissed. (Doc. 32 at 19.) Accordingly, the Court **GRANTS** summary judgment to Officer Shures and Det. Hensley on Count 4, the claim for deprivation of substantive due process.

### 3. Count 5: Malicious Prosecution Under Ohio Law

Similar to his claim for malicious prosecution in violation of the Fourth Amendment, Zulock also has alleged a claim against Det. Hensley for malicious prosecution in violation of Ohio common law. The elements of the claim under Ohio law are as follows: "(1) malice in instituting (or continuing) the prosecution, (2) lack of probable cause, and (3) termination of the action in favor of the defendant." Harris v. Bornhorst, 513 F.3d 503, 520 (6th Cir. 2008) (citation omitted). This claim also fails as a matter of law because Zulock cannot establish that Det. Hensley lacked probable cause based on the facts he knew. Therefore, the Court **GRANTS** summary judgment to Det. Hensley on Count 5, the claim for malicious prosecution in violation of Ohio law.

### 4. Count 6: Respondeat Superior

Finally, Zulock alleges a claim for respondeat superior under Ohio common law against the City of Middletown for the actions taken by Det. Hensley only. (Doc. 32 at 19.) The Court has found that Det. Hensley did not commit a state law tort against Zulock, and therefore, there

is no basis to hold the City of Middletown liable for Det. Hensley's actions. The Court

**GRANTS** summary judgment to the City of Middletown on the respondeat superior claim.

**B.** **Claims Against Defendant Shures**

    **1.** **Count 1: Excessive Force**

Zulock asserts that Officer Shures violated his Fourth Amendment rights when he used

excessive force in seizing him. Officer Shures asserts that his use of force was reasonable and

that he is entitled to qualified immunity. The Court first must determine whether Shures'

conduct violated Zulock's Fourth Amendment rights. See Saucier, 533 U.S. at 201 (explaining

qualified immunity analysis). The issue is whether Officer Shures' use of deadly force was

reasonable.

The Supreme Court explained when the use of deadly force is reasonable in the seminal

case of Tennessee v. Garner:

> Where the officer has probable cause to believe that the suspect poses a threat of
> serious physical harm, either to the officer or to others, it is not constitutionally
> unreasonable to prevent escape by using deadly force. Thus, if the suspect
> threatens the officer with a weapon or there is probable cause to believe that he
> has committed a crime involving the infliction or threatened infliction of serious
> physical harm, deadly force may be used if necessary to prevent escape, and if,
> where feasible, some warning has been given.

471 U.S. 1, 11-12. The Supreme Court in Garner instructed that police officers could not use

deadly force on a fleeing felony suspect "[w]here the suspect poses no immediate threat to the

officer and no threat to others." Id. at 11. However, "when a police officer both knows a

defendant has a weapon *and* has a reasonable belief that the weapon will be used against him or

others, the officer is justified in using deadly force." Bouggess v. Mattingly, 482 F.3d 886, 896

(6th Cir. 2007) (emphasis in the original). The reasonableness of an officer's action in using

deadly force "depends primarily on objective assessment of the danger a suspect poses at that moment." Id. at 889. The Sixth Circuit has focused on the following non-exclusive list of factors in attempting to apply Garner:

> (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Id.

An officer's use of deadly force is justified in order to protect himself or another from a knife attack. Gaddis v. Redford Twp., 364 F.3d 763, 776 (6th Cir. 2004). However, the mere fact that a suspect is holding a knife does not justify an officer's use of deadly force. "[I]t is reasonable as a matter of law for an officer to use deadly force only when a suspect is both holding a knife and engaged in some other threatening activity." Chappell v. City of Cleveland, No. 1:06CV2135, — F. Supp.2d —, 2008 WL 4533675, *17 (N.D. Ohio Sept. 30, 2008) (surveying cases). Determinations that an officer's use of deadly force was either justified or protected by qualified immunity have been highly fact-specific. Compare Untalan v. City of Lorain, 430 F.3d 312, 315-16 (6th Cir. 2005) (finding that officer was entitled to qualified immunity when he used deadly force on a schizophrenic suspect who had attacked another officer with a butcher knife and was fighting with his father for control of the knife); Estate of Larsen v. Murr, 511 F.3d 1255, 1260-61 (10th Cir. 2008) (finding use of deadly force to be objectively reasonable where the suspect had threatened violence, carried a knife with a blade more than one foot in length, refused to drop the weapon, raised the knife over his shoulder and pointed it at the officers, and took a step towards one officer from whom he was seven to twenty feet away) with Walker v. City of Orem, 451 F.3d 1139, 1159-60 (10th Cir. 2006) (finding

excessive force where officer shot suspect who was carrying a small knife, but was at least twenty-one feet away, was not advancing at the officer or making threats, and was in the process of lowering the knife when he was shot); Phong Duong v. Telford Borough, 186 F. App'x 214, 217 (3rd Cir. 2006) (stating that a reasonable jury could find a Fourth Amendment violation where the officer shot a suspect who was holding knife approximately thirteen feet from the officer, but was sitting down and pointing the knife away from the officer, and where the officer did not first give a command to drop the knife).

Officer Shures cites to his training and to expert testimony for the proposition that it is reasonable for an officer to use deadly force against a suspect who is wielding a knife within twenty-one feet of the officer. A sister district court in the Northern District of Ohio conducted a survey of case law on this issue and concluded that "it [is] not the mere presence of a knife within a 21-foot zone . . . , but the threatening wielding of a knife in that zone" that is legally significant. Chappell, 2008 WL 4533675, at *18-19 (holding that officers were not entitled to qualified immunity when they shot a suspect carrying a knife in his bedroom who was five to seven feet away from the officers and who did not respond to a command to drop the knife, but who was on the other side of a mattress from the officers, who had raised his hand holding the knife when told to show his hands, and who might not have heard the officers announce their presence in the house).

Officer Shures went to Zulock's house as part of his investigation of the hit-and-run accident.[7] Assuming there was no serious bodily injury caused during the accident, and there is

_____

[7] The Ohio hit-and-run statute states in relevant part:

(A) In case of accident to or collision with persons or property upon any of the

18

no evidence before the Court to suggest that anyone was injured, the offense was a misdemeanor.

O.R.C. § 4549.02(B). Thus, the nature of the underlying offense factor does not support Officer

Shures' use of deadly force. See Bouggess, 482 F.3d at 889 (setting forth factors to help apply

Garner standard).

The circumstances changed, however, at Zulock's residence. Officer Shures confronted a

suspect who was carrying a bread knife with a ten-inch blade and who was using abusive

language. Multiple material facts about the confrontation remain in dispute, however. Did

Zulock brandish the knife or point the knife at Officer Shures in a threatening manner when

Shures first arrived at the residence? Did Zulock tell Officer Shures "Fuck you, motherfucker.

Kill me."? Had Officer Shures and Zulock taken steps towards each other for the purpose of

---

public roads or highways, due to the driving or operation thereon of any motor
vehicle, the person driving or operating the motor vehicle, having knowledge of
the accident or collision, immediately shall stop the driver's or operator's motor
vehicle at the scene of the accident or collision and shall remain at the scene of
the accident or collision until the driver or operator has given the driver's or
operator's name and address and, if the driver or operator is not the owner, the
name and address of the owner of that motor vehicle, together with the registered
number of that motor vehicle, to any person injured in the accident or collision or
to the operator, occupant, owner, or attendant of any motor vehicle damaged in
the accident or collision, or to any police officer at the scene of the accident or
collision.

* * *

(B) Whoever violates division (A) of this section is guilty of failure to stop after
an accident, a misdemeanor of the first degree. If the violation results in serious
physical harm to a person, failure to stop after an accident is a felony of the fifth
degree. If the violation results in the death of a person, failure to stop after an
accident is a felony of the third degree.

O.R.C. § 4549.02.

Officer Shures securing Zulock after Zulock put down the knife?  How far apart were Officer

Shures and Zulock when Zulock picked back up the knife?  After Zulock picked back up the

knife, did he advance towards Officer Shures or threaten him with the knife?  Or did Zulock

immediately turn away from Officer Shures and toward the back of the house in order to put the

knife in the kitchen sink?  How did a bullet strike Zulock in the back of the shoulder if Zulock

was advancing towards Officer Shures?

Because of these material disputed facts, the Court cannot conclude as a matter of law

that Officer Shures had probable cause to believe that Zulock posed a threat of serious physical

harm to him or another person justifying the use of deadly force.  See Garner, 471 U.S. at 11-12.

For example, if Zulock was approximately twenty feet from Officer Shures, and if Zulock did

not brandish or point the knife at Officer Shures, and if Zulock was turning away from Officer

Shures when he was shot in the back of the shoulder, then a reasonable jury could conclude that

Officer Shures used excessive force against Zulock in violation of his Fourth Amendment rights.

The right of an individual not to be subjected to the use of deadly force by an officer who lacks

probable cause to believe that the individual posed a threat of serious harm to the officer or

others was clearly established in 2006.  See Bouggess, 482 F.3d at 896 (stating that the right was

clearly established in 2004).  Officer Shures is not entitled to qualified immunity at this stage in

the litigation.  The Court **DENIES** summary judgment to Officer Shures as to the excessive

force claim.

2. **Count 2:  Illegal Arrest**

Zulock also alleges that Shures arrested him without probable cause in violation of the

Fourth Amendment.  Officer Shures moves for summary judgment on the grounds that he had

probable cause to arrest Zulock as a matter of law and on the basis of qualified immunity. Again, the Court begins its analysis of these related issues by examining whether a constitutional violation occurred.

"The Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." DeFillippo, 443 U.S. at 36. It is irrelevant to the validity of the arrest whether a suspect is later acquitted of the crime for which he was arrested. Id. Again, probable cause is defined "as facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. at 37. An arresting officer's state of mind regarding, or subjective reasons for, making an arrest are irrelevant to the existence of probable cause. Devenpeck v. Alford, 543 U.S. 146, 153 (2004). "Subjective intent of the arresting officer . . . is simply no basis for invalidating an arrest." Id. at 154-55. Moreover, the offense establishing probable cause need not be "closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest." Id. (citation omitted).

The issue here is whether Officer Shures had probable cause to arrest Zulock for felony assault.[8] To review, Ohio's felony assault law states that "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." Ohio Rev. Code 2903.11(A)(2). The act brandishing of a knife

---

[8] Shures' argument is that he had probable cause to arrest Zulock for the felony assault charge. Shures does not argue that he had probable cause to arrest Zulock for the hit-and-run accident that preceded the incident at the house.

can be sufficient to justify a felony assault charge. <u>See</u> <u>e.g.</u>, <u>Wiseman</u>, 2005 WL 1502148, ¶¶ 19-23; <u>Rivers</u>, 2003 WL 21555127 ¶¶ 32-33.

Officer Shures first argues that Zulock is collaterally estopped from challenging probable cause based on the state court finding of probable cause at Zulock's preliminary hearing. In the prior discussion regarding the malicious prosecution claim against Det. Hensley, the Court discussed the principle that "a finding [of probable cause] in a prior criminal proceeding may estop an individual from relitigating the same issue in a subsequent civil action." <u>Hinchman v. Moore</u>, 312 F.3d 198, 202 (6th Cir. 2002). The principle does not apply, however, where a police officer is alleged to have provided false information to establish probable cause. <u>See</u> <u>id.</u> at 202-03; <u>OPW Fueling Components</u>, 2007 WL 1406956, *6. Zulock alleges that Officer Shures gave false testimony in the underlying criminal proceedings here. Therefore, collateral estoppel does not estop Zulock from challenging probable cause.

Turning to the merits, the Court again finds that genuine issues of material fact preclude summary judgment for Officer Shures. If Zulock merely used abusive language against Officer Shures, but remained twenty feet away from Officer Shures, did not advance towards Officer Shures with the knife, did not point or otherwise threaten Officer Shures with the knife, and immediately turned away from Officer Shures and toward the back of the house when he picked the knife back up, then a reasonable jury could conclude that Officer Shures lacked probable cause to arrest Zulock for felony assault. Officer Shures is not entitled to qualified immunity at the summary judgment stage. The Court **DENIES** summary judgment to Officer Shures on the illegal arrest claim.

### 3.    Count 3: Malicious Prosecution

Zulock also asserts a claim against Officer Shures for malicious prosecution in violation of the Fourth Amendment. Zulock asserts in his Complaint that both Officer Shures and Det. Hensley "caus[ed] criminal charges to be filed against Zulock." (Doc. 1 ¶ 35.) However, Zulock concedes in the briefing on summary judgment that it was Det. Hensley who initiated a charge of felony assault against Zulock. (Doc. 41 ¶ 78; Doc. 42 ¶ 25.) Moreover, Zulock does not state an independent basis supporting a malicious prosecution claim against Officer Shures separate from illegal arrest claim. Zulock has not established that Officer Shures made, influenced or participated in the decision to prosecute. See Peet, 502 F.3d at 580. Accordingly, the Court **GRANTS** summary judgment to Officer Shures on Count 3, the claim for malicious prosecution.

### 4. Count 4: Substantive Due Process

The Court previously **GRANTED** summary judgment to Officer Shures on this claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants City of Middletown and Frank Hensley's Motion for Summary Judgment (doc. 24) is **GRANTED** and the Defendant Thomas Shures' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** summary judgment to Defendant Shures as to Count 3 (malicious prosecution) and Count 4 (substantive due process) only and **DENIES** summary judgment to Defendant Shures as to Count 1 (excessive force) and Count 2 (illegal arrest).

IT IS SO ORDERED.

S/Susan J. Dlott_____
Susan J. Dlott
United States District Judge